THE LUCY P. MILLER.[1]

HALL v. THE LUCY P. MILLER.

(*District Court, S. D. New York.   October 21, 1891.*)

SALVAGE—STANDING BY VESSEL AGROUND.
    A steamer ran aground in the East river, near Hell Gate, early in the evening, during a dense fog. Her master signaled for help, and libelant's tug went to her assistance, and lay by her all night, most of the time pumping to keep down the water in her hold. No other tugs appeared during the night, though distress signals were occasionally sounded. It was important for the steamer to have aid at hand during the night, in case of emergency, and to keep down the water in her hold. In the morning, when the fog lifted, other tugs came, and all together took the steamer off the rocks to a place of safety. The value of the steamer and her cargo was about $38,000. *Held*, that the service of the tug was a salvage service, and she was allowed (the other claims being settled) an award of $750.

In Admiralty. Suit to recover salvage.
*Peter S. Carter*, for libelant.
*Goodrich, Deady & Goodrich*, for respondent.

BROWN, J. Early in the evening of April 15, 1891, the steamer Lucy P. Miller, in going east through Hell Gate, against the ebb-tide, just after she had passed Hallett's point, was caught by a sudden and dense fog, and ran aground close to Hog's Back, heading nearly parallel therewith to the eastward. It subsequently appeared that she had run in between two rocks, which crushed in her bottom, and made holes forward on each side about six or eight feet from her keel, through which she made water rapidly. Her master sounded signals for help, and the libelant's tug, H. W. Temple, which was lying at anchor at Astoria cove, in response to the signals, went to the Miller's assistance, reaching her about 8 o'clock P. M. The tug was fitted up with the usual wreck-

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

ing pumps, and lay by the Miller all night, most of the time pumping, for the purpose of keeping down the water in the hold. The Miller had a cargo of mixed merchandise. The cargo in the lower hold was submerged, but little of the cargo between decks was wet. Signals were occasionally sounded during the night; but no other tug came near until early the next morning, when the fog cleared up, and the steam-tug Fuller, approaching, was called in to assist. The Temple was not able alone to clear the hold of water, although it was claimed that she reduced its height in the ship. The Fuller was a larger vessel, with larger pumps, and the two together soon pumped out the water. They were easily able to keep her free of water, so that on the following flood, at about 3 P. M., she was hauled off, with the assistance of two other tugs, and taken to pier 49, where she was discharged during the following night. The claimant, having settled with the other tugs engaged, contends that the libelant is entitled only to a compensation by the hour, but slightly above that of an ordinary towage service. It is urged that the Temple's services were of no actual benefit to the steamer; and that at the moment when the steamer was hauled off the rocks the Temple did not have hold of her. The last circumstance is true; but only because, at the moment when the other tugs were preparing to pull the Miller off, the Temple, in accordance with the orders of the master of the Miller, was moving around from her port side to her starboard side, where she joined with the others in taking her to pier 49.

The service was, I think, essentially different from a towage service, and is not to be compensated for upon that basis only. The place where the Miller grounded was one of the most dangerous in Hell Gate. Her precise position and the precise danger could not be known in the dense fog. The libelant thought there was danger of her rolling over to starboard, as the tide went down; but, as it subsequently appeared that she was resting upon rocks on the starboard side also, that danger did not exist. But the approach to a vessel in that position through a dense fog, and in a powerful tide-way setting upon the rocks of Hog's Back, was itself a matter attended with some danger to the Temple; and, though skillful and careful management might doubtless avoid injury, as the Temple avoided it, still this element of danger is by no means to be overlooked, under such circumstances; and the fact that no other tug responded to the signals while the fog lasted is significant. The Temple might, no doubt, have pulled the Miller off the rocks; but she alone could not handle her in a strong tide, and the fog made it impracticable to do anything more than the Temple did until the fog cleared, and the other vessels came up, on the following day. In the mean time, however, it was important that the Miller should have a tug by her to keep the water down as much as possible, and to be ready to give her assistance in any emergency that might arise. This service the Temple rendered promptly, and, as I have said, not without some danger and difficulty in the dense fog; and she was constantly at the service of the master of the Fuller. Without referring to other details shown in the testimony, and considering that the value of the vessel and cargo was

about equal, amounting altogether to $38,000, I allow to the libelant $750 against both,—one-third to go to the officers and crew of the tug in proportion to their wages, the other two-thirds to her owners,—with costs.